**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER and PINSON, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**March 8, 2022**

# In the Court of Appeals of Georgia

A21A1275. MILNER v. MILNER.

PINSON, Judge.

Two brothers, Whit and Lat Milner, owned shares in a closely held insurance company. The shareholders' agreement required any shareholder who wanted to transfer his shares to notify the company and offer a first right of refusal to the company and other shareholders. Whit, however, agreed to sell his shares to his nephew, Chad, without notifying the company. After the company and Lat learned of the sale from Chad, Whit rescinded his agreement with Chad. Lat then tried to exercise his right of first refusal, but Whit refused to sell, and so Lat sued him to enforce his right. The trial court granted summary judgment and ordered Whit to sell his shares to Lat on the same terms he had given to Chad.

We affirm. Based on the language of the contract and settled contract law, Lat's right of first refusal was triggered when the company received notice of Whit's intention to sell his shares to Chad. That right endured even after Whit rescinded his agreement with Chad, because a right of first refusal ripens into an option when it is triggered, and options are irrevocable for the duration of the option. So the trial court properly granted specific performance to enforce Lat's right to buy the shares.

## Background

In 1982, four brothers and their father formed British American Insurance Intermediaries, Inc. ("BAII") to sell and broker insurance. The four brothers, BAII's original shareholders, signed a shareholders' agreement.

Most relevant here, that shareholders' agreement includes a section titled "Restriction on Sale, Transfer, or Encumbrance of Company Shares." In paragraph 2 (a) of that section, the shareholders "agree[d] that the Shares shall neither be sold, transferred, pledged, encumbered, nor otherwise disposed of without first giving written notice of the transaction and then offering a first right of refusal to the Company and to the other Shareholders." Paragraphs 2 (b) and 2 (c) then explain the procedure for when a shareholder desires to transfer his shares, which requires the shareholder to give "written notice of his intent to transfer" and then gives the

2

company and the other shareholders, "upon receipt" of that notice, a 30-day "option" to elect to purchase the shares at issue:

> b) Any Shareholder desiring to make a transfer of his Shares . . . shall give a written notice to the Company of his intent to transfer the Shares. That notice must state the identity of the proposed transferee, the terms of the transfer, the price, if any, offered by the transferee for the Shares, and other facts relevant to the transfer. . . .

> c) Upon receipt of such notification by the Company, the Company shall have an option for thirty (30) days, from the date of such receipt, to elect to purchase all, but not less than all, of the Shares the Transferor proposes to transfer. If the option is not exercised by the Company, then the other Shareholders shall have a similar option to purchase the Shares. . . .

Finally, section 7 of the shareholders' agreement, titled "Notices," requires that "[a]ny and all notices, . . . or any other communication herein provided for shall be in writing and hand delivered or given by registered or certified mail, postage pre-paid, addressed to the Company and its principal office, at to each Shareholder at his address[.]"

3

Over time, two of the brothers transferred their stock back to BAII, leaving the other two, hitner Reade Milner ("Whit") and Willis L. Milner ("Lat") as the remaining shareholders.

In 2017, Whit executed a stock purchase agreement to sell his shares in BAII to the parties' nephew, Sexias Milner, III ("Chad") for $10,000. The stock purchase agreement stated that Whit "agrees to sell the Shares" to Chad, set a closing date, and provided that the agreement "will constitute the valid and legally binding agreement." Whit did not give notice of the stock purchase agreement or the intended closing date to either BAII or Lat before executing the agreement. Seven days after Whit and Chad executed the agreement, Chad sent Lat an email notifying him of the stock purchase agreement and asking him to call a shareholders' meeting.

Later that month, BAII's counsel informed Whit by letter that BAII considered the stock purchase agreement to be written notice of his intent to transfer his shares, thus triggering BAII's 30-day option to purchase the shares under the right-of-first-refusal provision in the shareholders' agreement. BAII's counsel asked Whit, as a voting member of the board, to sign and return a corporate resolution allowing BAII to purchase the shares. Counsel further noted that if the board could not agree to such a purchase, the shareholders' agreement required Whit to extend the right of first

refusal to Lat, the remaining shareholder. Once notified of this requirement in the shareholders' agreement, Whit and Chad executed a rescission agreement, but Whit did not then execute the necessary corporate resolution to allow BAI to purchase the shares within 30 days, so BAII did not purchase the shares.

After BAII's 30-day option expired, Lat then sent Whit a letter seeking to buy the shares on the same terms set forth in the stock purchase agreement. During a conversation later that day, Whit accepted Lat's offer, and followed up with a few days later with text message to Lat stating his intent to transfer the stock to Lat. Whit did not, however, respond to Lat's later request to close.

As a result, Lat sued to enforce the terms of his agreement with Whit and raised claims for breach of contract, declaratory judgment, and specific performance. Lat moved for summary judgment, and the trial court granted the motion. The court found that Whit's execution of the purchase agreement qualified as a "shareholder desiring to make a transfer of his Shares," which "trigger[ed] the notice and option provisions of the Shareholders' Agreement, thereby vesting [Lat] with an irrevocable right to acquire such stock on the same terms within a specified time." Whit thus breached the shareholders' agreement by failing to notify BAII and Lat of his intent to sell and offer the shares to them on the same terms, and Lat had timely attempted to exercise

5

his option to buy the shares. The court went on to conclude that specific performance was an appropriate remedy for the breach because the stock was in a closely held corporation, and so the court ordered Whit to convey his BAII shares to Lat on the same terms he had accepted from his nephew. Whit appealed.

**Discussion**

We review the trial court's grant of summary judgment de novo, viewing the evidence in the light most favorable to the nonmoving party. *Cowart v. Widener*, 287 Ga. 622, 624 (697 SE2d 779) (2010).

Whit contends that the trial court erred in granting Lat's motion for summary judgment and ordering specific performance for three reasons. First, he argues that Lat's right of first refusal was never triggered because Whit never gave BAII written notice of his intent to sell. Second, he argues that his rescission of the stock purchase agreement with Chad precluded Lat from exercising his right of first refusal. And third, he argues that Lat failed to strictly comply with the notice requirement for exercising his right of first refusal. Applying settled principles of contract law, we conclude that the first two arguments lack merit. The third argument is waived.

6

1. Whit first contends that the trial court erred in granting specific performance because Lat's right of first refusal under Section 2 of the shareholders' agreement was never triggered. We disagree.

(a) As a threshold matter, we agree that the specific performance the trial court ordered was appropriate only if the right of first refusal had been triggered. Until a right of first refusal is triggered by whatever event or circumstances the contract specifies, it is "[e]ssentially a dormant option," *Walters v. Sporer*, 298 Neb. 536, 471 (1) (905 NW2d 70) (2017), or as our courts have described it, a "preemptive right." *Hasty v. Health Serv. Ctrs., Inc.*, 258 Ga. 625, 626 (373 SE2d 356) (1988). In that state, the right holder cannot force the owner to sell; he has a contingent right only.

This changes "when the owner decides to sell." *Hasty*, 258 Ga. at 626 (emphasis omitted). When that happens—and once whatever evidence of that intention that the contract requires (here, "notice") is established—the right of first refusal is "trigger[ed]," or "ripens" into an enforceable option. 25 Williston on Contracts § 67:89 (4th ed. 2021); see, e. g., *Walters*, 298 Neb. at 547–48 (1) (a) (2017) ("Essentially a dormant option, a right of first refusal is merely contingent until the condition precedent is met, at which point the preemptive right ripens into a full option."); *Chapman v. Mut. Life Ins. Co. of New York*, 800 P.2d 1147, 1150

(Wyo. 1990) ("We agree with the view that when the condition precedent of the owner's intention to sell is met the right of first refusal 'ripens' into an option and contract law pertaining to options applies."); see also *Hasty*, 258 Ga. at 626 (explaining that the person holding the right of first refusal "must be offered the opportunity to buy" "*when the owner decides to sell*") (emphasis in original). At that point (and only then), a right-of-first-refusal holder who has exercised the "ripened" option is generally entitled to specific performance of the new contract formed by acceptance of the option—that is, the right holder can compel the owner to sell on whatever terms the option provided. See *Hasty*, 258 Ga. at 626 (affirming grant of specific performance requiring sale to right holder after right of first refusal was triggered); *Walters*, 298 Neb. at 549 (1) (a) (stating that a right of first refusal "may be enforced by specific performance when it can be proved that the condition triggering the right has occurred and the option holder was ready, able, and willing to buy during the period"); 25 Williston on Contracts § 67:89 (4th ed.) ("It is sometimes stated that a right of first refusal ripens into an option upon the owner's intention to sell, entitling the right holder to specific performance, though that remedy is not available before the option ripens."); id. § 67:87 (explaining that an accepted

8

option is enforced by requiring specific performance of "the contract which arises upon acceptance of the option").

Here, there is no question that the trial court ordered specific performance of the new contract formed when Lat exercised his option under the shareholders' agreement. In other words, by ordering Whit to convey his shares to Lat on the same terms as the purchase agreement he had with Chad, which was precisely what the option set out in the shareholders' agreement provided. Because Lat is only entitled to such specific performance if his right of first refusal was triggered—thus giving him an enforceable option—we must determine whether that right was triggered in the first place.

(b) The question whether the right of first refusal was triggered requires construction of the BAII shareholders' agreement. See, e. g., *Hewatt v. Leppert*, 259 Ga. 112, 114, 376 SE2d 883) (1989) (construing the "language of the first refusal clause" to determine that a right of first refusal was not triggered). Contract construction is ordinarily a question of law for the court, *Simpson v. Pendergast*, 290 Ga. App. 293, 296 (1) (659 SE2d 716) (2008), and the steps are familiar: If the relevant contract language is "clear and unambiguous," we "enforce[] the contract

9

according to its clear terms." *Langley v. MP Spring Lake, LLC*, 307 Ga. 321, 323 (834 SE2d 800) (2019). If, on the other hand, the language is "ambiguous in some respect," we "apply the rules of contract construction to resolve the ambiguity." Id. Finally, "if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury." Id.

As we understand it, the best version of Whit's argument goes something like this: Paragraph 2 (b) of the agreement requires "[a]ny Shareholder desiring to make a transfer of his Shares" to "*give a written notice* to the Company of his intent to transfer the Shares" that states the identity of the transferee, the terms and offer price, and "other facts relevant to the transfer." Paragraph 2 (c) then explains that, "*[u]pon receipt of such notification*," BAII "shall have an option for thirty (30) days, from the date of such receipt, to elect to purchase" the shares. (If, as here, BAII does not exercise its option, "the other Shareholders shall have a similar option" beginning on the last day of BAII's option period.) In Whit's view, this language indicates that only written notice *from the shareholder* that he intends to transfer his shares can trigger the "option clause" of Paragraph 2 (c). Because Whit never sent the notice contemplated by these paragraphs, he argues that the option clause, which ultimately

10

would give Lat the right to buy Whit's shares on the terms offered to Chad, was never triggered.

We are not persuaded. It is true that the option clause is triggered when BAII receives notice of a shareholder's intent to transfer shares. The agreement specifies that BAII's option is triggered "upon receipt of such notification." By using the phrase "such notification," the agreement points back to the just described "written *notice* to the Company of [the Shareholder's] intent to transfer the Shares." See Bryan A. Garner, *Modern English Usage* 873 (explaining that "*such* is a pointing word that must refer to a clear antecedent" and is used "when reference has previously been made to a category of people or things"). Thus, the option clause here is not triggered until BAII receives written notice of a shareholder's intent to transfer shares.

But the agreement does not narrow the triggering event to only the receipt of a notice *sent by the shareholder himself*, as Whit suggests. Instead, the best reading is that the option clause is triggered when the company receives notice of the shareholder's intent to sell, regardless of whether the shareholder himself complied with his obligation to send that notice himself. The text of this agreement, legal context, and common sense together compel this construction.

11

Start with the text itself. Paragraph 2 (c) explains that BAII's option right arises "[u]pon receipt of such notification by the Company." This language makes clear that the trigger for the option right is BAII's "receipt" of the notification about the shareholder's intent to sell, not the shareholder's (or anyone's) act of sending a notice. To be sure, the previous paragraph, Paragraph 2 (b), says the "Shareholder . . . shall give a written notice to the Company of his intent to transfer the Shares." But that separate language is imposing an obligation on the shareholder, not specifying the trigger for the right of first refusal. That role is handled by Paragraph 2 (c) alone. Paragraph 2 (c) could have easily specified that the triggering event is the receipt of the notice *sent by the shareholder* by including a clause along those lines. That it instead identifies as the trigger only the "receipt" of the previously described notification is at least some evidence that the option clause is triggered as long as the company receives notice of the intent to sell—regardless of who sent, or how the company got, the notice the company "recei[ves]." Accord *Hasty*, 258 Ga. at 626 (where operative agreement similarly required owner to give written notice of intent to sell to right-of-first-refusal holder, right of first refusal was triggered despite owner's failure to give such notice after owner granted option to third party to buy the property).

12

This reading makes even more sense in light of established law on rights of first refusal. As a general matter, a right of first refusal is a right to buy property "when the owner decides to sell." *Hasty*, 258 Ga. at 626 (emphasis omitted); *IH Riverdale, LLC v. McChesney Capital Partners*, 280 Ga. App. 9, 12 (1) (b) (633 SE2d 382) (2006). It is thus well understood that such intent or "willingness of the owner to sell" is the basic condition that triggers a "right of first refusal." 25 Williston on Contracts § 67:89 (4th ed.); see, e.g., *Booker v. Hall*, 248 Ga. App. 639, 641 (1) (a) (548 SE2d 391) (2001) (Right of first refusal "sets a requirement that when the owner decides to sell the person holding the preemptive right must be offered the opportunity to buy"). And our courts have concluded that the owner's willingness to sell may be proved—and the right thus triggered—by a showing that the owner "committed himself to sell" the property on specific terms by entering into a contract to that effect. *Hasty*, 258 Ga. at 626; see also *Phoenix Tower, Inc. v. Shaffer*, 254 Ga. App. 394, 395 (562 SE2d 788) (2002) (lessor's "receipt and acceptance of an offer to purchase the property" triggered right of first refusal). This settled understanding of what triggers a right of first refusal is part of the legal backdrop that parties bring in when they contract for such a right by using that well-known term. *Archer W. Contractors, Ltd. v. Estate of Pitts*, 292 Ga. 219, 224 (735 SE2d 772) (2012) ("[T]he

13

context in which a contractual term appears always must be considered in determining the meaning of the term.") (emphasis omitted). Whit's interpretation, already a stretch in light of the agreement's language, departs from that settled understanding by deeming clear proof of an intent to sell—execution of a sale contract for the shares—insufficient to trigger the right. Our reading, on the other hand, is consistent with the ordinary understanding of how a right of refusal operates. All else equal, we favor a construction that is consistent with the ordinary understanding of a right of first refusal over one that rejects that understanding. Id.; see also OCGA § 13-2-2 (2).

Finally, common sense bolsters this conclusion. The whole point of a right of first refusal is to prevent an owner from selling property without first giving the right holder a chance to buy it. See *Hewatt v. Leppert*, 259 Ga. 112, 113 (376 SE2d 883) (1989) (quoting 1A Corbin on Contracts § 261 at p. 471 (1963)) ("When a lease contains a right of first refusal clause the [owner] 'is under a legal duty to [the right holder] *not to sell* to anybody at any price until after he has made an offer to sell to [the right holder] at that price and [the right holder] has failed to accept it.'") (emphasis in original.); 25 Williston on Contracts § 67:89 (4th ed.) (right of first refusal "limits the right of the owner to dispose freely of its property by compelling the owner to offer it first to the party who has the first right to buy"). That singular

14

purpose would be completely defeated by Whit's interpretation. In his view, a shareholder can avoid triggering this right of first refusal at will by breaching his separate notice obligation. Simply put, that can't be right. Cf. *Ga. 20 Props. LLC v. Tanner*, 255 Ga. App. 6, 10 (2) (564 SE2d 459) (2002) ("A party cannot avoid the obligations of a contract by frustrating the performance of a condition precedent"). We generally presume that parties do not include meaningless or inoperative language in contracts. See *Am. Cas. Co. of Reading, Pa. v. Etowah Bank*, 288 F.3d 1282, 1287 (11th Cir. 2002) (applying Georgia contract law, explaining that "a contract ought to be interpreted so that every section of it has a function"); see also OCGA § 13-2-2(4) ("The construction which will uphold a contract in whole and in every part is to be preferred."). We decline to adopt a construction of a right of first refusal that would effectively destroy the right of first refusal that it expressly provides.

For all of these reasons, we conclude that the right of first refusal here is triggered when the company receives notice of the shareholder's intent to sell, regardless of whether the shareholder himself complied with his obligation to send that notice. Such intent to sell is established when an owner "commit[s] himself to sell" the property on specific terms by entering into a contract to that effect. *Hasty*, 258 Ga. at 626. Thus, when BAII received notice from Chad that Whit executed a

15

purchase agreement with Chad, it triggered the shareholders' agreement's right of first refusal.

2. Whit next contends that the trial court erred in enforcing Lat's right of first refusal because Whit's later rescission of the stock purchase agreement with Chad precluded Lat from exercising his right. He grounds this argument in case law that distinguishes rights of first refusal from options and says that only the option "gives to the holder the power to compel a sale by an unwilling owner." *Hasty,* 258 Ga. at 626.

This argument is mistaken. It is true that a right of first refusal is different from a pure option *before* it is triggered. Before a right of first refusal is triggered, it is a "preemptive right" that does not permit the right holder to force the owner to sell. Id.; see also *Hewatt*, 259 Ga. at 113. But, as we explained above, once a right of first refusal *is* triggered, it ripens into an option. And it is well settled that an option is "irrevocable" for its duration. *TST, Ltd., Inc. v. Houston*, 256 Ga. 679, 680 (2) (353 SE2d 26) (1987); see 1 Williston on Contracts § 5:16 (4th ed.) (explaining that an option "constitutes a continuing irrevocable offer" that "cannot be unilaterally withdrawn"). So here, once BAII received notice of Whit's purported sale of his shares to Chad and its right of first refusal thus ripened into an option, Whit had no

16

power to prevent BAII or Lat from exercising the option for its duration, whether by rescinding the purchase agreement or otherwise. *Pargar, LLC v. CP Summit Retail, LLC*, 316 Ga. App. 668, 671 (730 SE2d 136) (2012) (explaining that "an option contract binds the offeror," while "the holder of the option retains the discretion whether to accept the offer"); Ga. Contracts Law and Litigation § 3:7 (2d ed.) (defining an option as "a unilateral agreement binding on the optionor").

3. Whit finally contends that the trial court erred in granting specific performance because Lat failed to strictly comply with the notice requirement for exercising his right of first refusal. Whit points out that the letters BAII and Lat sent him asking to buy the shares were sent only by email or postal mail and did not comply strictly with the notice requirements of the shareholders' agreement.

This argument is waived. Whit did not attack Lat's purported lack of compliance with the terms for exercising his right of first refusal before the trial court, and we will not consider it for the first time on appeal. See *Pfeiffer v. Ga. Dept. of Transp.*, 275 Ga. 827, 829 (2) (573 SE2d 389) (2002) (when reviewing a trial court's summary judgment order, "absent special circumstances, an appellate court need not consider arguments raised for the first time on appeal"). Whit contends in his reply brief that he preserved this argument below by arguing that "inaction

constituted a waiver of the option to purchase" and that "no corporate formalities have been exercised since BAII's inception." But even if we were inclined to address an argument raised for the first time in a reply brief, *Barron v. Wells Fargo Bank, N. A.,* 332 Ga. App. 180, 187 (4) (769 SE2d 830) (2015), we do not think those generalized statements sufficient to preserve this argument.

*Judgment affirmed. Dillard, P. J., and Mercier, J., concur*.